## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | No. 19 CR 615 |
| v.    ) | |
| ) | Judge John Z. Lee |
| DON MORGAN,    ) | |
| ) | |
| Defendant.    ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On a snowy afternoon in February 2018, an anonymous 911 caller reported that a tall Black man in a beige leather coat and a white and red hat had a gun in his pocket. When Chicago Police Department ("CPD") officers responded to that call in a marked police vehicle, they saw a man closely matching that description looking over his shoulder and hurriedly walking into a nearby residence. The officers confronted the man while he waited in the vestibule of the residence, ordered him out of the building, handcuffed and searched him, and recovered a firearm from his waistband. That man was the Defendant in this case, Don Morgan.

Morgan was booked and charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). He now moves to suppress the gun, arguing that the officers did not have reasonable suspicion to stop and frisk him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). For the reasons set forth below, Morgan's motion is denied.

# I.  <u>Background</u>

The Court conducted an evidentiary hearing in this matter and heard testimony from CPD Officers William Watson and Jason Davis, as well as from Morgan.[1]  The government also submitted video taken from a police observation device ("POD") camera, Watson and Davis's body-worn camera footage, and audio from the 911 call.  The following are the Court's factual findings based on the evidence presented at the hearing and submitted with the parties' briefs.  In making these findings, the Court has weighed the testimony and demeanor of the witnesses who testified at the evidentiary hearing.

## A.  Findings Based on Uncontested Recorded Evidence

In the afternoon on February 18, 2019, Don Morgan was standing on a snowy sidewalk in front of 5648 South Morgan Street in the Englewood neighborhood of Chicago.  Gov't Ex. 2, Police Observation Device Video ("POD Video") at 1:05.  Morgan was at that address to visit a family friend who lived there, 1/22/21 Tr. at 95:2–11, and just before 3:00 p.m., he was outside talking to two other friends, POD Video at 1:05; 1/22/21 Tr. at 94:4–9.

At 2:57 p.m., an anonymous man called 911.  Gov't Ex. 1A, 911 Call at 0:00–06.  He stated: "There's a guy walking down 56th and Morgan, with a beige leather coat on, with a white and red cap on, with a gun in his pocket."  *Id.* at 0:10–22.  When asked, the caller further elaborated that the individual was wearing a black

---

[1]     Due to exigencies related to the COVID-19 pandemic, Officer Wilson testified on November 2, 2020, and Officer Davis and Mr. Morgan testified on January 22, 2021.

hood in addition to the red and white cap, and that the individual was tall, Black, and proceeding north on Morgan toward West 56th Street. *Id.* at 0:35–48.

Shortly before 2:59 p.m., the dispatcher asked officers to report to 56th and Morgan to investigate. Gov't's Ex. 1B, Zone 8 Dispatch 1455–1555 Hours at 3:45– 4:15. The Englewood neighborhood is an area known for gun violence and narcotics. *See* 11/2/21 Tr. at 4:10–11.

The scene on Morgan Street was captured on the POD camera located at the corner of Morgan and West 57th Streets. At 2:59 p.m., three men are seen conversing on the sidewalk. POD Video at 1:05; 1/22/21 Tr. at 99:2–12. One of them is wearing a beige and red letterman-style jacket with a black hood up over a red and white cap; another holds a shovel he had just used to clear some snow from the sidewalk; and the third is wearing a black hoodie. POD Video at 1:05. Morgan is the individual wearing the letterman-style jacket. 1/22/21 Tr. at 100:11–12.

Thirty seconds after 3:00 p.m., the friend with the shovel heads inside. POD Video at 2:31–41. After lingering on the street for another twenty seconds, Morgan begins to walk south—in the direction of 57th Street—toward the multi-residential building at 5648 South Morgan. *Id.* at 2:50–3:00. As he approaches the building, Morgan briefly looks north over his right shoulder in the direction of the man in the black hoodie. *Id.* Then, Morgan proceeds to jog up a short set of stairs to 5648 South Morgan's small front porch. *Id.*

At 3:01 p.m., Morgan opens the door to the residence, and a marked police car simultaneously speeds into the frame of the POD camera, traveling north on Morgan from 57th Street toward 56th Street. *Id.* at 3:00–3:05. Because the POD camera has been zoomed in on 5648 South Morgan Street, only that address and the lot immediately south of it are visible in the frame; but, it is reasonable to conclude that the officers in the vehicle could see Morgan before their car appears on the video. *Id.* The police car did not have its lights or sirens turned on. *Id.*; 11/2/20 Tr. at 25:3–19.

Just as the police car comes to a stop in front of 5648 South Morgan Street, Morgan can be seen entering the vestibule of the residence. POD Video at 3:05–3:12. As two police officers—Davis and Watson—exit the vehicle and race toward the building, the door to the vestibule shuts behind Morgan. *Id.* Five seconds after the vestibule door closes, Officer Davis opens it with his hand, gun pointed at Morgan. *Id.* at 3:09–3:14. Morgan then comes out of the building with his hands raised, *id.* at 3:14–3:23, and Officer Watson proceeds to handcuff him, Gov't Ex. 3A, Officer Watson's Body-Worn Camera Video ("Watson's BWC") at 0:01. Once Morgan is handcuffed, Davis retrieves a firearm from Morgan's waistband. *Id.* at 0:08–0:11; *see also* 1/22/21 Tr. at 105:6–9.

About twenty seconds later, the video shows Watson activating his body-worn camera,[2] and almost immediately thereafter, an unidentified officer can be

---

[2]   The body-worn cameras used by the officers typically capture and save thirty seconds of video in their buffer memory prior to their activation by the officer. However, these thirty seconds of video have no sound. 11/2/20 Tr. at 18:10–19:7.

heard saying, "You almost got lit the fuck up." *Id.* at 0:30–33. Although the next few seconds of audio are indistinguishable, Morgan can be heard asking, "How am I reaching when I'm cuffed up, huh?" *Id.* at 0:33–38. The first speaker responds, "Before—we told you not to reach." *Id.* at 0:38–42. As Watson continues to pat Morgan down, Morgan says, "I ain't got nothing else on me, bro." *Id.* at 0:42–44.

The officers then escort Morgan to the street. At this point, three marked and two unmarked police vehicles can be seen parked in front of the residential complex. *Id.* at 1:01. Morgan is placed in the back seat of a marked squad car, where he is given his *Miranda* warnings and asked if he has a FOID—or Firearm Owners Identification—card.[3] *Id.* at 2:18–3:15. Morgan responds, "I'm bogus, man, I know what the lick is." *Id.* at 3:15–19. Watson interpreted this statement to mean that Morgan did not have a FOID card. 11/2/20 Tr. at 23:15–24:3. The officers then transported Morgan to the station to be booked. 1/22/21 Tr. at 90:19–25.

## B. Findings Based on Disputed Testimony

While the preceding factual findings follow directly from undisputed recorded evidence, the parties contest additional details not captured on video or audio. First, the government contends that, when Morgan briefly looked north over his shoulder (away from Davis and Watson's marked car approaching from the south) while walking up the stairs at 5648 South Morgan, he must have seen

---

[3]    "No person may acquire or possess any firearm, stun gun, or taser within [Illinois] without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Department of State Police." 430 Ill. Comp. Stat. 65/2(a)(1).

a second, unmarked police vehicle that was approaching from that direction. *See* 11/2/20 Tr. at 21:21–22:16. From this inference, the government argues that Morgan's jog up the steps of 5648 South Morgan indicated his desire to evade the police.

But the record does not support this inference. Morgan looked down the street a full fifteen seconds before Davis and Watson's marked vehicle stopped in front of 5648 South Morgan. *See* POD Video at 2:52–3:07; *see also* 1/22/21 Tr. at 100:8–23. And Morgan testified convincingly that he was looking north toward his friend in the black hoodie (with whom he had been speaking earlier) and not toward the unmarked police car. *See* 1/22/21 Tr. at 100:8–23. In fact, because the marked squad car that first arrived on the scene did not have its lights or sirens turned on, the Court accepts Morgan's testimony that he did not see or hear either police vehicle before Officer Davis opened the vestibule door to the building. *See* 1/22/21 Tr. at 94:21–95:1.

Second, the government claims that the speed at which Morgan traveled up the stairs to the front door of 5648 South Morgan cast him in a suspicious light. But the POD video shows that, although Morgan did ascend the stairs at a brisk pace, the manner at which he climbed the stairs was not atypical of anyone who traverses a short set of stairs. *See* POD video at 2:53–59.

In addition to Morgan's pace, however, the government points to testimony by both officers that, as they were exiting their vehicle, Davis called to Morgan and instructed him to stop, but Morgan did not comply. *See* 11/2/20 Tr. at 16:20–

17:5 (Watson); 1/22/21 Tr. at 64:17–19 (Davis). Based on that, combined with Morgan's bounding up the stairs, both officers stated that they believed Morgan's conduct was evasive. Davis testified: "Based on m[y] giving clear verbal direction and based on the nature of the call, I believe that [Morgan's] entry into that residence was an attempt by the suspect to evade contact with myself." 1/22/21 Tr. at 64:17–19. Watson similarly stated: "As we w[ere] pulling up, we observed him. He observed us. He turned around rapidly as if he was going to flee into the building, which he attempted to do." 11/2/20 Tr. at 32:3–10. Watson subsequently clarified that Morgan "didn't run, but he briskly walked into the vestibule at that residence." *Id.* at 32:25–33:1; *see also id.* at 39:11–17.[4]

Morgan provided a different perspective on the events. He testified that, after completing his conversation with the other two men, he went to 5648 South Morgan to visit a family friend. *Id.* at 94:24–95: 11. Morgan further recounted that he did not see or hear any police officers until Officer Davis opened the vestibule door and pointed a firearm at Morgan. *Id.* at 96:2–97:3; 107:15–109:8. The POD video tends to corroborate this account: it shows Morgan moving toward 5648 South Morgan shortly after the man with the shovel heads into another nearby residence, and the third man begins to cross the street. POD Video at 2:31–3:00. By the time the marked police car driven by Davis and Watson enters the

---

[4]     Watson also testified that Davis ran up the stairs and arrived at the front door in time to prop the vestibule door open with his foot before it closed—a conclusion that is contradicted by the video evidence. *See* 11/2/20 Tr. at 18:6–9; POD Video at 3:05–3:12. In fact, Davis acknowledged that he had to reopen the vestibule door with his hand after he reached the porch. 1/22/21 Tr. at 64:20–5.

frame, Morgan is already on the porch and opening the vestibule's outer door. *Id.* at 3:01–05. When Davis and Watson are opening their car doors, Morgan's body is already turned toward the inner door of the vestibule, *id.* at 3:03–3:10, and the outer door is closed by the time that Davis and Watson fully exit the police vehicle, *id.*

It bears mentioning, however, that Officers Watson and Davis arrived too late to observe the conversation that Morgan was having with the other men on the street. *See* POD Video at 2:31–41; 3:00–05 (showing the man with the shovel heading inside over thirty seconds before the marked police vehicle enters the POD camera view). Nor were the officers aware that Morgan knew the man in the hoodie, who was crossing the street to the north of Morgan. What the officers did see when they arrived at the scene was a man, who fit the 911 caller's description, looking over his shoulder (in the direction of what the officers knew to be an unmarked police vehicle) and heading into a residential building at a hurried pace. The Court therefore credits Davis and Watson's testimony that they found Morgan's behavior suspicious.

Third, the parties dispute what Morgan did or said after Davis opened the vestibule door and before the body-worn camera footage begins. Officer Davis testified that he saw Morgan reach toward his waistband when Davis first opened the vestibule door. 1/22/21 Tr. at 87:21–23. And both officers testified that immediately after Davis confronted Morgan in the vestibule, Morgan stated words to the effect of "I have a gun." 11/2/20 Tr. at 18:3–9; 1/22/21 Tr. at 66:8–10.

According to Davis, Morgan also said the gun was in his waistband. 1/22/21 Tr. at 75:13–17. By contrast, Morgan denied reaching toward his waistband or telling the officers that he had a gun. 1/22/21 Tr. at 97:10–98:15.

To support the officers' account, the government relies on several details. First, it points to the fact that Davis and Watson immediately searched Morgan's waistband—not his pocket, where the 911 caller had stated the gun would be—after handcuffing Morgan. 1/22/21 Tr. at 75:13–17 (Davis's testimony); *see also id.* at 105:6–9 (Morgan admitting that Officer Davis "immediately went to [his] waistband area to recover that firearm"); Watson's BWC at 0:08–0:11. The government also relies on the verbal exchange that was captured on video, in which the unidentified officer told Morgan, "You almost got lit the fuck up"; Morgan responded, "How am I reaching when I'm cuffed up, huh?"; and the first speaker replied, "Before—we told you not to reach." Watson's BWC at 0:30–42. Additionally, the paperwork prepared by each officer shortly after the arrest notes that Morgan made a voluntary statement that he possessed a gun prior to being frisked. *See* 11/2/20 Tr. at 4:18–45:4.

Morgan, in turn, points out that each officer reported Morgan's alleged statement about the gun "non-verbatim" in the paperwork, insinuating that, in filling out reports shortly after the events in question, the officers should have remembered exactly what he had said—if he actually had said it. *See id.*; *see also* Gov't's Ex. 4, Case Incident Report at 2 (indicating that Davis prepared the report at 4:34 p.m. on the day of the incident). Furthermore, Morgan observes that

Davis's case report neither mentions that Morgan reached toward his waistband nor indicates that Morgan specified the location of the gun when he allegedly alerted the officers to its presence. 1/22/21 Tr. at 87:21–89:18. Morgan also flags other inconsistencies between the officers' testimony and the video evidence—for example, each officer testified that he was the one who placed Morgan in handcuffs, *see* 11/2/20 Tr. at 42:15–16; 1/22/21 Tr. at 65:25, 66:12–13, even though the body-worn camera video clearly shows that it was Watson, *see* Watson's BWC at 0:00–05.

After weighing the evidence presented and the credibility of each witness, the Court finds that Officer Davis reasonably believed that Morgan reached for his waistband before complying with his commands. Davis's testimony is corroborated by the contemporaneous video evidence that (1) Davis immediately searched Morgan's waistband, not his pocket, and (2) an unknown officer stated that Morgan was nearly "lit . . . up" after the officers "told [him] not to reach." *See* Watson's BWC at 0:08–0:11, 0:30–42. As for whether Morgan voluntarily admitted to possessing a gun, the Court need not decide this issue for the reasons discussed below.

## II.     Legal Standard

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. When a criminal defendant moves to suppress evidence discovered pursuant to a warrantless search, "the government carries the burden to bring the case within

one of the exceptions to the warrant requirement." 3A Charles Alan Wright and Arthur R. Miller, Fed. Prac. & Proc. Crim. § 689 (4th ed. 2021). The Fourth Amendment analysis "focus[es] on reasonableness," which "balanc[es] the need to search (or seize) against the invasion which the search (or seizure) entails." *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020) (quoting *Terry*, 392 U.S. at 21).

"A seizure occurs within the meaning of the Fourth Amendment if, in the totality of the circumstances, a reasonable person would not feel free to disregard the police and move along." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). For a seizure to take place, the subject must either "actually yield to a show of authority from the police or be physically touched by the police." *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005) (cleaned up). The "standard for determining when a suspect has yielded to a show of authority is an objective one, viewed from the perspective of a reasonable officer under the circumstances." *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010); *see also United States v. King*, 439 F. Supp. 3d 1051, 1054 (N.D. Ill. 2020).

"When the [seizure] is less than that involved in a full-fledged arrest, the degree of suspicion required is less [than probable cause]." *United States v. Serna-Barreto*, 842 F.2d 965, 966 (7th Cir. 1988). Under the Supreme Court's decision in *Terry*, police may stop a person "if they have reasonable suspicion that he is engaged in criminal activity." *Howell*, 958 F.3d at 597 (citing *Terry*, 392 U.S. at 21–22). The reasonable suspicion "inquiry is fact-intensive: [courts] look to the totality of the circumstances to see whether police 'ha[d] a particularized and

objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 597–98 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Reasonable suspicion requires more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 1136 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "In making a reasonable suspicion assessment, 'it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?'" *United States v. Correa*, No. 12-CR-20075, 2013 WL 3778426, at *3 (C.D. Ill. July 19, 2013) (quoting *United States v. Mancillas,* 183 F.3d 682, 695–96 (7th Cir.1998)).

### III.   Analysis

Morgan argues that he was seized the moment that Officer Davis opened the vestibule door and pointed his firearm at Morgan. At that point, Morgan asserts, the officers did not have the requisite quantum of suspicion to stop him, because "an anonymous tip that a person is carrying a gun is, without more, [not] sufficient to justify a police officer's stop and frisk of that person." *Florida v. J.L.*, 529 U.S. 266, 268 (2000); *see also Howell*, 958 F.3d at 601 ("The caution the Supreme Court sounded in [*J.L.*] warrants underscoring."). As such, the Court must determine (1) when Morgan was seized; (2) whether the seizure was a *Terry* stop, which requires reasonable suspicion of criminal activity, or an arrest, which

requires probable cause; (3) whether the officers had sufficient suspicion to make the stop; and (4) whether the officers had sufficient suspicion to perform the frisk that uncovered the firearm. The Court will discuss each issue in turn.

## A.     Timing of Morgan's Seizure

As an initial matter, the Court finds that Morgan was not seized until he had complied fully with Officer Davis's command to put his hands in the air. The timing of a seizure is determined by evaluating in the totality of the circumstances. *See Howell*, 958 F.3d at 597. "[C]ircumstances that might indicate a seizure [has occurred]," include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Here, all the witnesses agreed that Davis and Watson approached the vestibule with their guns drawn and pointed at Morgan. *See* 11/2/21 Tr. at 41:5–10; 1/22/21 Tr. at 65:12–25, 96:2–25. That conduct was a "show of authority" by the police; as such, Morgan is deemed to have been seized once he has submitted to their authority. *See Marquez v. Jackson*, No. 13 C 3278, 2016 WL 4720017, at *4 (N.D. Ill. Sept. 9, 2016) (recognizing that an officer who approaches a suspect "with his gun drawn and his badge on display" has asserted his or her authority). And an individual submits to police officers when he puts his hands up in the air or otherwise obeys their orders. *See United States v. Bey*, 911 F.3d 139, 144 (3d

Cir. 2018) ("The district court correctly ruled that the seizure occurred the moment Bey submitted to police authority by raising his hands and turning to face the officers who had drawn their guns."); *King*, 439 F. Supp. 3d at 1054 (holding that an individual who put his hands up while also backing away from police officers was not seized until one of the officers grabbed the suspect's wrist) (citing *United States v. Mosley*, 743 F.3d 1317, 1327 (10th Cir. 2014)).

Here, as discussed above, Officer Davis reasonably believed that Morgan reached for his waistband after Davis ordered him to raise his hands and before Morgan fully complied with this command. Thus, Morgan was not seized until *after* he put his hands up in the air. *See United States v. Denson*, 488 F. App'x 314, 317–18 (10th Cir. 2012) (affirming district court's finding that a suspect reaching toward his waistband had not yet been seized and that such a reach would be considered suspicious and evasive).

## B. Whether the Seizure Was a *Terry* Stop Or Arrest

The next question is whether Morgan's seizure was an investigative stop— requiring reasonable suspicion—or a full-fledged arrest—requiring probable cause. *See Howell*, 958 F.3d at 597–98. "The distinction between a stop and an arrest is one of degree." *Serna-Barreto*, 842 F.2d at 967. Courts consider the totality of the circumstances, including the "officer's intent, impression conveyed, length of stop, questions asked, [and] search made." *Id*. "The mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety."

*United States v. Moore*, No. 1:19-CR-84-HAB, 2020 WL 3170337, at *3 (N.D. Ind. June 15, 2020); *see also United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (noting that "police officers do not convert a *Terry* stop into a full custodial arrest just by drawing their weapons . . . or handcuffing the subject" (citations omitted)). And where there is a possibility that a suspect has a weapon, measures like drawing weapons and handcuffing the suspect are appropriate. *See United States v. Vaccaro*, 915 F.3d 431, 436 (7th Cir. 2019).

Here, because the officers were responding to a call about an individual with a firearm and Officer Davis reasonably thought that Morgan had reached toward his waistband, the Court finds that the officers' use of their firearms and handcuffs to effectuate Morgan's seizure did not convert the *Terry* stop into a full-fledged arrest. Thus, the officers need only have had reasonable suspicion—*i.e.*, "a particularized and objective basis for suspecting"—that Morgan was engaging in criminal activity for the stop to be valid. *See Cortez*, 449 U.S. at 417–18.

## C.   Whether the Stop and Frisk Were Supported By Reasonable Suspicion

Having established when Morgan was seized and the quantum of suspicion required to justify that seizure, the Court turns to the degree of suspicion that Officers Davis and Watson had, based on the facts then known to them, at the moment Morgan was seized. *See Mitchell v. City of Indianapolis*, No. 18-cv-00232, 2020 WL 1532201, at *10 (S.D. Ind. Mar. 31, 2020) (noting that the sufficiency of the officer's suspicion "is tested by viewing 'the facts and circumstances within [a police officer's] knowledge' 'at the moment the decision [to seize] was made,'

disregarding later acquired information" (alterations in original) (quoting *Qian v. Kautz*, 168 F.3d 949, 953–54 (7th Cir. 1999)).

### 1. The Stop

Morgan argues that this case is controlled by the Supreme Court's decision in *J.L.*, which held that "an anonymous tip that a person is carrying a gun," without more, is not "sufficient to justify a police officer's stop and frisk of that person." 529 U.S. at 268. In that case, the police officers received an anonymous tip much like the one at issue here: the caller "reported to the Miami–Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* When officers arrived at the scene, they found a group of three young Black males; J.L. was the only one wearing a plaid shirt. *Id.* Based on nothing but the anonymous 911 call, the police stopped J.L., frisked him, and recovered a gun. *Id.* The Supreme Court held that the stop of J.L. violated the Fourth Amendment, because in order to create suspicion sufficient to justify a *Terry* stop, "a tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

Thus, under *J.L.*, an anonymous 911 call is "too barebones to support a frisk [when] it identifie[s] only 'readily observable' traits such as race, sex, clothing, location, and age." *Howell*, 958 F.3d at 602 (quoting *J.L.*, 529 U.S. at 272). That said, an anonymous tip can achieve "sufficient indicia of reliability" to justify a *Terry* stop in a variety of ways. *J.L.*, 529 U.S. at 270 (cleaned up).

For example, the Supreme Court noted that, where an anonymous tip predicts the subject's behavior and officers can verify those predictions, that enhances the reliability of the tip's allegations of criminality. *See J.L.*, 529 U.S. at 270–71 (citing *Alabama v. White*, 496 U.S. 325, 329–32 (1990)); *see also id.* at 271 (noting that a tipster's demonstrated "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs"). Indeed, *White* is illustrative. There, the Supreme Court held that the tip in question was sufficiently reliable to justify the stop of a woman possessing cocaine because the anonymous caller had predicted that the suspect would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named hotel. *Id.* (citing *White*, 496 U.S. at 329–32). And before the police stopped the suspect, they surveilled her and verified that the informant had accurately predicted the woman's non-criminal, observable movements. *Id.* at 270–71 (citing *White*, 496 U.S. at 329–32). As such, "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *White*, 496 U.S. at 332.

More recently, in *Navarette v. California*, the Supreme Court also held that where an anonymous caller "necessarily claim[s] eyewitness knowledge of the alleged" criminal activity, that "lends significant support to the tip's reliability." 572 U.S. 393, 399 (2014). And when the report of alleged criminal activity is

clearly contemporaneous, it will be "treated as especially reliable" because "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Id.* at 399–400 (quoting Fed. R. Evid. 803 advisory committee's notes). Additionally, "when the tip is not one of general criminality, but of an ongoing emergency," that "might justify a search based on a lesser showing of reliability." *United States v. Hicks*, 531 F.3d 555, 558–59 (7th Cir. 2008) (citations omitted).

Here, the 911 call was not sufficient, by itself, to generate the requisite reasonable suspicion to stop Morgan. Like the 911 call in *J.L.*, the "barebones" description of the man with the gun "identified only 'readily observable' traits such as race, sex, clothing, location, and age." *See Howell*, 958 F.3d at 602 (quoting *J.L.*, 529 U.S. at 272). The caller did not accurately predict Morgan's movements; on the contrary, the caller reported that the suspect would be moving north on Morgan Street toward 56th Street, whereas Morgan was stationary and then headed south to enter the 5648 South Morgan residence. Nor did the caller contact law enforcement to report an ongoing emergency. *See Hicks*, 531 F.3d at 557, 559 (finding an ongoing emergency that distinguished the case at hand from the "mere possession of a firearm" at issue in *J.L.* where the caller reported ongoing domestic violence and the dispatcher instructed officers to respond using the codes for "domestic disturbance" and "suspect armed"). Thus, Officers Davis and Watson needed additional "specific and articulable facts indicating that criminal activity

may be afoot" upon arriving at the scene before stopping any suspects found there. *See Howell*, 958 F.3d at 598 (cleaned up).

To that point, the government argues that the evasive behavior the officers perceived as they arrived at the scene, coupled with Officer Davis's perception that Morgan reached toward his waistband after being confronted in the vestibule, sufficiently bolstered the information that the officers learned from the 911 call to create a reasonable suspicion that Morgan was engaged in criminal activity when considering the totality of the circumstances. The government also notes that the Englewood neighborhood is known for gun violence and drugs, which counts "among the relevant contextual considerations in a reasonable suspicion analysis." *See Richmond*, 924 F.3d at 411–12.

As set forth above in the Court's factual findings, Davis knew the following facts at the moment he seized Morgan: (1) an anonymous 911 caller had provided a detailed and relatively unique description of an individual in a beige leather coat with a red and white cap and black hood allegedly possessing a gun;[5] (2) the location identified by the caller is known for gun violence; (3) a man closely matching that description was present on the exact block identified by the caller; (4) that man appeared to have seen an unmarked police vehicle before moving quickly into a nearby residence; (5) the man did not stop when Davis ordered him to "stop"; and (6) when confronted, the man appeared to reach toward his

---

[5]        In this way, this case is distinct from a case where the caller's account "could describe hundreds, if not thousands, of Chicagoans." *See King*, 439 F. Supp. 3d at 1055 (discussing a description of "a tall black man wearing a dark puffy coat during [the winter]").

waistband before putting his hands up. After considering the totality of the circumstances from the perspective of a reasonable officer in Davis's position, the Court finds that the officers' suspicion was reasonable and sufficient to support their seizure of Morgan.

### 3. The Frisk

Even though the initial stop of Morgan was valid under the Fourth Amendment, the Court must nonetheless analyze the frisk separately. "[B]ecause a frisk is more intrusive than a stop[,] . . . the Fourth Amendment compels [an] additional armed-and-dangerous inquiry": a court must consider whether the police officer can "point to specific and articulable facts" showing "that the persons with whom he is dealing may be armed and presently dangerous." *Howell*, 958 F.3d at 598; *see also Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979). But here, given that the criminal activity the officers reasonably suspected was precisely that Morgan was "armed and presently dangerous," *Howell*, 958 F.3d at 598, and that the stop and frisk happened at nearly the same time, the validity of each essentially rises and falls together. As such, the Court finds that the officers also had reasonable suspicion to frisk Morgan for weapons. *See United States v. Adair*, 925 F.3d 931, 937–38 (7th Cir. 2019) (holding that frisk was warranted where 911 call singled out the defendant from a group as the suspect likely possessing a gun, the defendant moved evasively, and the police officer noticed a bulge in the defendant's pocket).

Thus, the Court concludes that neither the stop nor the frisk of Morgan violated his Fourth Amendment rights.

## **CONCLUSION**

Because both the stop and the frisk of Morgan were supported by reasonable suspicion, the Court finds that Morgan's Fourth Amendment rights were not violated.  For the foregoing reasons, Morgan's suppression motion is denied.

**IT IS SO ORDERED.**                    **ENTERED:  5/28/21**

_____
**JOHN Z. LEE**
**United States District Judge**